UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAN TOKARZ, d/b/a J.J. STORE,

        Plaintiff,

    -against-

LOT POLISH AIRLINES, a/k/a POLSKIE
LINIE LOTNICIZE, MILLENIUM TOURS,
P&F INTERNATIONAL, INC., and
AMERICAN TRAVEL ABROAD, INC.,

        Defendants.
-----------------------------------------------------------x



**MEMORANDUM AND ORDER**
Case No. 96-CV-3154 (FB) (JMA)

*Appearances:*
*For the Plaintiff:*
MATTHEW E. MOLOSHOK, ESQ.
Hellring, Lindeman, Goldstein & Siegel, LLP
One Gateway Center
Newark, NJ 07102-5386

*For Defendant LOT Polish Airlines:*
MICHAEL J. HOLLAND, ESQ.
Condon & Forsyth, LLP
Times Square Tower
7 Times Square, 18th Floor
New York, NY 10036

**BLOCK, Senior District Judge:**

## INTRODUCTION

Plaintiff, Jan Tokarz, d/b/a J.J. Store ("J.J."), sues defendant LOT Polish

Airlines, a/k/a Polskie Linie Lotnicize ("LOT").[1]  As it is undisputed that the Polish

government owns the majority interest in LOT, jurisdiction is proper under the Foreign

Sovereign Immunities Act, 28 U.S.C. §§ 1330 & 1602-11.

In an amended complaint dated September 29, 1998, J.J. asserts claims for

---

[1]J.J. has also sued three other defendants: P&F International, Inc. ("P&F"),
American Travel Abroad, Inc. ("AmTA"), and Millenium Tours ("Millenium").  P&F,
though served, has never appeared in the action.  The parties have stipulated to dismiss
AmTA without prejudice, and to join Millenium as a defendant in a related case, *Tokarz
v. Albatross Travel, et al.*, Case No. 00-CV-3372 (E.D.N.Y.), which has been stayed
pending the outcome of this case.

breach of contract, fraud, tortious interference with prospective economic advantage, and violations of antitrust law; all claims arise out of LOT's termination of J.J.'s authority to sell LOT tickets and an ancillary commission agreement. A bench trial was held on January 23-26, 2006. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      LOT provides nonstop service between New York and Poland; other carriers also provide service between New York and Poland, but with stops at their respective European hubs.

2.      LOT distributes its tickets through a system of authorized agents, some of whom deal directly with the ticket-buying public, and some of whom (known as "wholesalers") deal with intermediaries (known as "subagents") who, in turn, deal with the public.

3.      During the relevant time period, LOT offered its agents a base commission of 10%.

4.      LOT also offered certain agents a "Volume Override Commission Agreement," or "VOCA," under which LOT agreed to pay "override" commissions over and above the 10% base commission based on the volume of the agent's ticket sales.

5.      Under LOT's VOCA, the agent was entitled to deduct the base commissions, plus a portion of the override commissions, from the amounts remitted to LOT ("the front end"); the remainder of the override commissions due were paid by LOT after the end of the year ("the back end").

6. Paragraph 7 of LOT's VOCA provided that "[n]o portion of the override commission paid may be used in any way to reduce the airfare paid by the passenger below LOT published transatlantic tariffs," Pl.'s Exs. 1 & 2; thus, as LOT's sales director for the United States, Pawel Lodzinski ("Lodzinski"), testified at his deposition, "anytime an agent sells below [the] face value the ticket, [the] agent breaches the contract." Def.'s Ex. X, at 67:16-17.

7. A VOCA remained in effect for one calendar year; however, paragraph 9 of the VOCA provided that either "AGENT or LOT may terminate th[e] Agreement by giving the other party one month notice in writing." *Id.*

8. J.J. is a family-run business in Greenpoint, Brooklyn, offering a number of goods and services to the large Polish community there.

9. In the early 1990s, J.J. began selling airline tickets, principally to Poland and principally on LOT.

10. J.J. initially sold tickets as a subagent for authorized ticket agents.

11. In 1995, J.J. received accreditation from the Airlines Reporting Corporation and the International Airlines Travel Agent Network; by virtue of these accreditations, J.J. became an authorized agent for LOT and other airlines.

12. In May 1995, LOT and J.J. entered into a VOCA for the 1995 calendar year under which LOT agreed to pay J.J. the base commission of 10% plus override commissions that ranged between 1% and 8% depending on the volume of J.J.'s sales; J.J. was entitled to retain between 1% and 7% of the override commissions at the front end, with LOT making up the difference at the back end.

3

13.     On January 6, 1996, LOT and J.J. entered into a VOCA for the 1996 calendar year under which LOT agreed to pay J.J. the base commission of 10% plus override commissions of between 3% and 6% depending on the volume of J.J.'s sales; J.J. was entitled to retain between 3% and 4% of the override commissions at the front end, with LOT making up the difference at the back end.

14.     There are approximately 30-40 travel agencies selling LOT tickets in the Greenpoint area; these agencies compete by passing along varying portions of their commissions to customers, thereby effectively discounting ticket prices below LOT's published fares.

15.     During the relevant time period, J.J.'s competitor retained, on average, 6% of their commissions, passing the remainder on to customers.

16.     During the same time period, J.J. retained, on average, 0% of its front-end commissions, passing 100% of those commissions – both base and override – on to customers and expecting to do business in a volume sufficient to earn back-end commissions.

17.     J.J.'s practice of passing on its front-end override commissions to customers was a breach of Paragraph 7 of the VOCA; although other agents also sometimes passed part of their override commissions on to customers, no agent did so to the same extent that J.J. did.

18.     At some point in 1995, one of J.J.'s competitors, Peter Pachecz ("Pachecz"), complained to Lodzinski about J.J.'s prices, expressing concern that J.J. had negotiated a better deal with LOT; Lodzinski told Pachecz to submit his complaint in

writing.

19.    On December 13, 1995, Lodzinski sent J.J. a letter "to inform you that selling methods used by your agency do not conform with the [1995 VOCA] and specifically with Paragraph 7 of that Agreement," Pl.'s Ex. 3; in the letter, Lodzinski asked J.J. "to refrain immediately from selling LOT services at dumping prices," and warned that if J.J. did not honor the request, "we shall be forced to take more drastic measures to ensure protection of our interests." *Id.*

20.    On April 16, 1996, Pachacz and five other Greenpoint travel agents sent Lodzinski a letter accusing J.J. of selling LOT tickets "in a manner compromising [the] principle of healthy competition," and asking LOT to reevaluate its decision to make J.J. an authorized agent, Pl.'s Ex. 8; the letter made no mention of any threats to stop selling LOT tickets or to take any other action if LOT continued to deal with J.J.

21.    On April 22, 1996, Lodzinski sent J.J. a letter "categorically declar[ing]" that its continued "method of dumping LOT Polish Airlines tickets [is] against our interest in the USA and contradict[s] [the] conditions of [the VOCA] for 1996," and prohibiting J.J. from deducting anything more than the 10% base commission from LOT fares. Pl.'s Ex. 5.

22.    On May 28, 1996, Lodzinski sent J.J. yet another letter reiterating that LOT had "requested immediate discontinuation of rebating from published fares," and warning that "our patience has expired. After June 01, we will have no alternative but to exercise more drastic measures." Pl.'s Ex. 7.

23.    On June 12, 1996, LOT revoked J.J.'s authorization to sell LOT tickets.

24.    On July 1, 1996, Lodzinski sent J.J. a letter "confirming termination of

the [VOCA], due to J.J. Store's material breach of the Agreement," Pl.'s Ex. 14, i.e., J.J.'s use of all of its up-front commissions to discount published airfares in violation of Paragraph 7 of the VOCA.

25.    Although LOT did not enforce Paragraph 7 against agents who retained at least some of their up-front commission, agents who passed all of that commission on to customers were of special concern to LOT; the Court credits Lodzinski's deposition testimony that an agent who made no front-end profit on ticket sales (1) posed a credit risk in that part of the agent's weekly remittances to LOT would have to come out of the agent's own pocket, *see* Defs. Ex. X, at 44-45 ("[A]gents who sell below [their] own costs put[] . . . an airline in risk," and (2) disrupted the incentive to sell LOT tickets – as opposed to tickets on other airlines – that the commission structure was intended to create. *See id.* at 47:11-13 ("[W]e . . . want travel agents to make money because we don't believe that travel agents are selling a given airline for making no profit on it.").

26.    LOT has, on at least two other occasions, terminated agents for using all of their up-front commission to discount ticket prices.

27.    Because an increase in commissions would increase the overall price customers paid for LOT tickets, LOT – which competes, to some extent, with other airlines – had no economic incentive to assist its agents in increasing their retained commissions.

28.    Based on the foregoing facts, the Court finds that LOT's termination of its VOCA with J.J. was a unilateral decision to enforce Paragraph 7, as LOT was contractually entitled to do, and not part of any concerted action with J.J.'s competitors to maintain or increase retained commissions.

<u>CONCLUSIONS OF LAW</u>

**A. Antitrust Claims**

The bench trial focused exclusively on J.J.'s claims that LOT terminated its VOCA (1) to assist J.J.'s competitors in an attempt to fix their retained commissions (Count IV), and (2) to attempt to fix the resale price of its tickets (Count V). Both claims are based on section 1 of the federal Sherman Act, 15 U.S.C. § 1, and New York's Donnelly Act, N.Y. Gen. Bus. L. § 340; as the two statutes are identical in all material respects, there is no need to analyze them separately. *See Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250, 254 (S.D.N.Y. 1995) ("[T]he Donnelly Act was modelled on the Sherman Act and should be construed in light of federal precedent.").

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is . . . illegal." 15 U.S.C. § 1. Thus, to succeed on any section 1 claim, the plaintiff "must first establish a combination or some form of concerted action between at least two legally distinct economic entities." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). To discharge this burden, the plaintiff must prove, by a preponderance of the evidence "that the [alleged] conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

By contrast, "[u]nilateral conduct on the part of a single person or enterprise falls outside the purview of this provision in the antitrust law." *Capital Imaging Assocs.*, 996 F.2d at 542. Of particular relevance here are the Supreme Court's admonitions in *Monsanto*

7

*Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), that a single entity (such as LOT) "generally has a right to deal, or refuse to deal, with whomever it likes, so long as it does so independently," *id.* at 761, and "can announce its resale prices in advance and refuse to deal with those who fail to comply." *Id.* (citing *United States v. Colgate & Co.*, 250 U.S. 300 (1919)).

In deciding whether an antitrust defendant's conduct was unilateral or part of a conspiracy, "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [the defendant] had no rational economic motive to conspire, and if [its] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986); *see also id.* at 587 ("[I]f the factual context renders [an antitrust plaintiff's] claim implausible – if the claim is one that simply makes no economic sense – [the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary."). Moreover, when, as here, an antitrust claim is brought by a terminated distributor, "something more than evidence of complaints [by the distributor's competitors] is needed." *Monsanto*, 465 U.S. at 764. "There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.*

The only evidence suggesting that LOT's action was anything other than unilateral is (1) complaints by J.J.'s competitors, culminating in the April 16, 2006 letter, and (2) LOT's inconsistent enforcement of Paragraph 7. With regard to competitor complaints, there may well be circumstances in which an airline has a motive to collude with its agents

to drive a renegade agent out of the market; for example, a letter from several agents threatening to stop doing business with the airline unless the renegade is terminated might lead the airline to comply and join the conspiracy. Here, however, there is no evidence that LOT perceived the April 16th letter as anything more than a complaint by six of J.J.'s 30 to 40 competitors; as the Supreme Court noted, such "complaints about price-cutters are natural – and from the manufacturer's perspective, unavoidable – reactions by distributors to the activities of their rivals." *Monsanto*, 465 U.S. at 763 (internal quotation marks omitted). With regard to LOT's enforcement of Paragraph 7, the Court credits LOT's proffered explanation that J.J.'s price-cutting practices justified a departure from its usual indifference to agents' use of their commissions to create customer discounts.

In sum, J.J. failed to demonstrate the LOT terminated its VOCA in furtherance of a common plan with other Greenpoint agents to fix either retained commissions or ticket prices. As a result, J.J. cannot prevail on its antitrust claims.

## B. Other Claims

Although not addressed at trial or in post-trial submissions, J.J.'s claims for breach of contract, tortious interference and fraud have not been formally withdrawn; nevertheless, with one exception, J.J. cannot prevail on those claims.

J.J. claims that LOT's termination of its VOCA was a breach of that agreement. The VOCA, however, plainly provides that either party may terminate the agreement on thirty days' written notice. As LOT provided the requisite notice, it was entirely within its contractual rights in terminating the agreement. LOT concedes, however, that it has not paid J.J. all commissions due for the period when the VOCA was

9

still in effect; the amount of the commissions owed remains in dispute.

In its tortious interference claim, J.J. alleges that LOT's termination of its VOCA interfered with J.J.'s relationship with its customers. While perhaps true, J.J. must also establish, *inter alia*, that "the defendant acted solely out of malice, or used dishonest, unfair, or improper means," *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003); as noted, LOT's termination of its VOCA with J.J. was a proper exercise of its contractual rights.

In its fraud claim, J.J. alleges that in negotiating the 1996 VOCA, LOT intentionally misrepresented that it was offering the same deal to all its agents. Even assuming that to be true, J.J.'s claim that but for the misrepresentation, it would have secured more favorable terms in the 1996 VOCA is sheer speculation.

## CONCLUSION

All of J.J.'s claims against LOT are dismissed, except to the extent that J.J. seeks unpaid commissions for the period during which its VOCA with LOT was in effect.[2] On that issue, the parties are directed to negotiate in good faith the amount of commissions owed, and if no settlement is reached, to appear on Tuesday, October 24, 2006, at 11:00 a.m. to set a hearing date.

**SO ORDERED.**

/signed/

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 29, 2006

---

[2]LOT contends that the unpaid commissions total $28,358.45, while J.J. contends that they total $97,728.00.